The Honorable Sandra D. Rogers State Representative P.O. Box 595 Hope, AR 71802-0595
Dear Representative Rogers:
I am writing in response to your request for my opinion regarding certain provisions of a Jail Agreement (the "Agreement"), dated November 19, 1992, between the City of Hope and Hempstead County. You have supplied with your request a copy of correspondence from Hope City Manager Catherine Cook, in which she specifically draws my attention to paragraph 10 of the attached Agreement, which provides:
 City agrees that the Hope Police Department will provide the necessary personnel to operate and dispatch the County Sheriff's Department and the various rural Fire Associations in Hempstead County, as well as the City's Police Department. County agrees that, in the event a countywide emergency dispatching system is approved by the voters of Hempstead County, County will appropriate those funds to City for operation of the system.
The rest of the Agreement essentially calls for the construction of a jail facility on property donated by the city, to be built and maintained from the proceeds of a 1/2 % countywide sales tax. The Agreement acknowledges "that much of the crime patrol, investigation and prevention in the County is performed by the City and that adequate jail space for both the County and City is necessary to protect all residents of Hempstead County." Apparently in consideration of the city's contribution of property, assistance in razing buildings on the property, assistance to the county in the form of dispatch services to the Sheriff's Department and rural fire associations, and general law enforcement efforts, the Agreement requires the county to provide the city police office space in the jail, as well as a specified percentage of the bed space available to house city prisoners, subject to the condition that the sheriff "will be solely responsible for operation of the jail facility, except for the Hope Police Department office space." Ms. Cook further reports the following:
 The City of Hope provides all services necessary to provide both 911 operations and dispatching as well as normal dispatching for Hempstead County. The City also provides dispatching for all the volunteer fire departments in the County.
Against this backdrop, Ms. Cook seeks my opinion on the following question:
 Is it permissible under current Arkansas law for Hempstead County to appropriate funds received from a county[-]wide emergency dispatching system (911 revenues) to the City of Hope so that the City of Hope can operate the 911 system so long as the funds are expended by the city pursuant to Arkansas Code § 12-10-323?
RESPONSE
Definitively answering your question would entail engaging in an inquiry into the facts, including the parties' various contractual obligations under the Agreement — an inquiry I am neither authorized nor equipped to conduct. However, under the general principles of law discussed below, I believe a finder of fact might well approve the appropriation you have described.
Subsections 12-10-318 through -321 of the Arkansas Code, contained within the Arkansas Public Safety Communications Act of 1985, A.C.A. § 12-10-301et seq. (Repl. 1999), set forth various mechanisms, including service charges and the issuance of bonds, whereby political subdivisions can fund emergency 911 reporting systems. I assume the "911 revenues" referenced in your question as the source of the proposed appropriation have been or would be raised pursuant to these mechanisms.
Section 12-10-323 of the Code, captioned "Authorized expenditures of revenues," provides:
 (a)(1) Any revenue generated pursuant to §§ 12-10-318—12-10-321 may be expended only in direct connection with the provision of 911 services and only for the following purposes:
 (A) The engineering, installation, and recurring costs necessary to implement, operate, and maintain a 911 telephone system;
 (B) The costs necessary for forwarding and transfer capabilities of calls from the 911 public safety communication center to dispatch centers or to other 911 public safety communication centers;
 (C) Engineering, construction, lease, or purchase costs to lease, purchase, build, remodel, or refurbish a 911 public safety communication center and for necessary emergency and uninterruptable power supplies for the center;
 (D) Personnel costs in the amount of seventy-five percent (75%) of the salary and benefits of each position charged with supervision and operation of the 911 public safety communication center and system;
 (E) Purchase, lease, operation, and maintenance of consoles, telephone and communications equipment owned or operated by the political subdivisions and physically located within and for the use of the 911 public safety communication center, and radio or microwave towers and equipment with lines which terminate in the center;
 (F) Purchase, lease, operation, and maintenance of computers, data processing equipment, associated equipment, and leased audio or data lines assigned to and operated by the 911 public safety communication center for the purposes of coordinating, forwarding of calls, dispatch, or recordkeeping of public safety and private safety agencies for which the 911 public safety communication center is the public safety answering point and to provide information assistance to those agencies; and
 (G) Supplies, equipment, public safety answering point personnel training, vehicles, and vehicle maintenance, if such items are solely and directly related to and incurred by the political subdivision in mapping, addressing, and readdressing a 911 system.
 (2) Nothing in this subsection shall be interpreted or construed as authorizing a political subdivision to purchase emergency response vehicles, law enforcement vehicles, or other political subdivision vehicles from such funds.
 (b) Expenditure of revenue generated by §§ 12-10-318—12-10-321 for purposes not identified in this section is expressly prohibited.
 (c) Appropriations of funds from any source other than §§ 12-10-318—12-10-321 may be expended for any purpose whatsoever and may supplement the authorized expenditures of this section and may fund other activities of the 911 public safety communication center not associated with the provision of emergency services.
Underlying your specific request is the general question of whether a city and a county might enter into an agreement whereby the county would in effect subsidize the city's operation of a countywide 911 service, subject to the condition that the subsidy be scrupulously expended in accordance with the provisions of A.C.A. § 12-10-323. I believe the answer to this question is clearly "yes." Section 12-10-305 of the Code, captioned "Multiagency and multijurisdictional answering," provides:
 (a)(1) The chief executive of the political subdivision may designate the 911 public safety communications center of another political subdivision either to serve his political subdivision as public safety answering point only and retain one (1) or more dispatch centers or to serve both public safety answering point and dispatch functions.
 (2) This designation shall be in the form of a written mutual aid agreement between the political subdivisions and will include the stipulation of the fair share of funding to be contributed by the political subdivision being served to the political subdivision operating the 911 public safety communications center.
 (3) Part or all of the moneys necessary for the fair share of funding may be generated as authorized in §§ 12-10-318, 12-10-319, 12-10-321, 12-10-322, and by the emergency telephone service charge collected by the service supplier and paid by them directly to the political subdivision operating the 911 public safety communications center.
 (4) If such a designation and mutual aid agreement has been made, an additional 911 communications center may not be created without official termination of the mutual aid agreement.
 (b) Any 911 public safety communications center established pursuant to this subchapter may serve the jurisdiction of more than one (1) public agency of the political subdivision or, through proper agreements, more than one (1) political subdivision.
 (c) No provision of this subchapter shall be construed to prohibit or discourage in any manner the formation of multiagency or multijurisdictional public safety answering points.
As reflected in this statute, the legislature has encouraged the formation of multijurisdictional 911 services. See Ark. Ops. Att'y Gen. Nos. 91-185 (discussing the terms of such an arrangement between Jefferson County and the City of Pine Bluff); 99-118 (discussing the possible termination of such an arrangement between Saline County and the City of Bryant). In my opinion, paragraph 10 of the Agreement, which was executed by the chief executives of both Hope and Hempstead County, clearly qualifies as a "written mutual aid agreement" of the sort referenced in A.C.A. § 12-10-305(a)(2). The only question, it seems to me, is whether paragraph 10 meets the requirement, also set forth in A.C.A. § 12-10-305(a)(2), that the mutual aid agreement "include the stipulation of the fair share of funding to be contributed by the political subdivision being served to the political subdivision operating the 911 public safety communications center." I believe a court would in all likelihood find that paragraph 10 of the Agreement meets this requirement. It specifies that the City of Hope will provide the necessary personnel and the Hempstead County will provide operating funds should the voters approve establishing an emergency dispatching system.[1] Although this allocation of contractual duties considered in isolation may seem lopsided in the city's favor, one must bear in mind that the county's conditional, executory commitment to finance the system was offered in consideration not only of the city's commitment to provide the dispatcher service, but also in consideration of the other commitments the city was obliged immediately to honor when the Agreement was executed in 1992. Moreover, the fact that this consideration alone might not be commensurate with that provided by the county cannot defeat the contract. See Stacy v. Lin, 34 Ark. App. 97, 107-08, 806 S.W.2d 15
(1991) ("[i]nadequacy of consideration will not preclude a contract between the parties. Landmark Savings Bank v. Weaver-Bailey Contractors,Inc., 22 Ark. App. 258, 739 S.W.2d 166 (1987).").
Given the factual variables that bear on your question, I cannot opine that Hempstead County definitely may appropriate 911 revenues to the City of Hope for operation of a 911 system. However, I can and will opine that nothing in the law as I understand it would preclude a county from contracting with a city to provide countywide 911 service to be financed in one or more of the ways set forth in A.C.A. §§ 12-10-318 through -321, so long as the city's provision of services accords with the conditions set forth at A.C.A. § 12-10-323. Although the Agreement appears to qualify as such a contract, only a court presented with all the facts can make this ultimate determination.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
[1] The latter provision is somewhat confusing. Section 12-10-304 of the Code declares that the chief executive of a political subdivision, not the voters, will decide whether to establish a 911 communications center. Subsection 12-10-318(a)(1) of the Code dictates that the voters must approve any proposed emergency telephone service charge. Section12-10-321 of the Code authorizes the governing body of any political subdivision to incur debt and issue bonds to finance a 911 service, apparently without voter consent. Given this statutory scheme, I presume the reference to voter approval in paragraph 10 is to approval of a countywide 911 service charge.